ANNA HELBERG, Appellee, v. W. D. KEPLER, Appellant.

**BOUNDARIES:** Acquiescence—Unfenced City Lots. Boundary lines by "acquiescence" take precedence over surveys. So held where a city lot was bought and improved with reference to the surveyor stakes thereon existing, followed by recognition of and acquiescence in such line by adjoining owners for some 20 years.

PRINCIPLE APPLIED: An addition was laid out, the lots being clearly indicated by stakes at each lot corner. The west half of a lot was bought with reference to the lot stakes thereon existing. A residence was erected 18 inches from the west line, as shown by the stakes, and a sidewalk was laid down, all with refer-

ence to such stakes. The adjoining owner on the west erected a residence on his lot, and knew that the owner to the east was claiming that the line was 18 inches west of his house. Just a fair driveway existed between the two houses. The two owners entered into an arrangement by which the entire space between the houses was cemented, and the owner to the east paid half the cost, in consideration of securing the right to use the space in delivering coal to his cellar. After the owner on the east and his grantors had so been in possession for some 20 years, the owner on the west claimed that the line 18 inches west of the residence on the east was incorrect. *Held*, the line had become fixed and determined by acquiescence, irrespective of any subsequent survey.

**ADVERSE POSSESSION:** Notice of Claim—Building with Reference to Survey Stakes. Valuable improvements erected on city lots with reference to the recognized survey stakes thereon existing, are notice to the world of the location of the boundary line as claimed by the owner.

*Appeal from Linn District Court.*—MILO P. SMITH, Judge

FRIDAY, NOVEMBER 17, 1916.

This is an action in equity, to establish a boundary line between the property of the plaintiff and the defendant. Opinion states the facts. Decree for the plaintiff in the court below.—*Affirmed.*

*C. E. Wheeler* and *O. N. Elliott,* for appellant.

*Deacon, Good, Sargent & Spangler,* for appellee.

GAYNOR, J.—This case involves a controversy as to the division line between plaintiff's and defendant's property. Plaintiff is the owner of the west 25 feet of Lot 14, subdivision of Outlot 16. Defendant is the owner of Lot 13 of subdivision of Outlot 16, lying immediately west, and adjoining plaintiff's lot.

It appears that Outlot 16 was subdivided and platted by the then owners of the land, on June 25, 1884; that, at the time it was subdivided and platted, stakes were placed at the corners of the several lots into which it was subdivided,

indicating the corners and lines of the lots. Through mesne conveyances from the owners, J. B. Scott became the owner of Lot 14 on August 4, 1893. On November 10, 1894, J. B. Scott and wife conveyed to Ellen O. Ricks, Lot 14. On September 30, 1899, Ellen O. Ricks conveyed the west 25 feet of Lot 14 to Albert Koontz. On September 24, 1904, Albert Koontz conveyed this 25 feet to Lydia Smith. On February 15, 1906, Lydia Smith and husband conveyed this west 25 feet of Lot 14 to the plaintiff.

At the same time that J. B. Scott acquired his owner-ship of the lot in which plaintiff's land is situated, he also acquired title to Lot 13, owned by the defendant. On August 4, 1893, J. B. Scott conveyed Lot 13 to one Lawson Daniels. Lawson Daniels died, and bequeathed this Lot 13 to his wife, Harriet Daniels. On June 30, 1906, she conveyed this Lot 13 to John and Charles W. Nye. On July 17, 1906, John Nye conveyed his interest to Charles Nye, and on March 6, 1911, Charles Nye conveyed the east 40 feet of Lot 13 to the defendant in this action. It would appear from this statement of the transfer of title that Ellen O. Ricks became the owner of Lot 14 in 1894; that she conveyed the east 25 feet of this lot to Albert Koontz, September 30, 1899; that, on September 24, 1904, Albert Koontz deeded it to Lydia Smith, and in 1906, Lydia Smith conveyed the property to the plaintiff. It appears that Mrs. Ricks, who became the owner of Lot 14, in 1894, erected two houses upon the lot. The first house was erected soon after she acquired the property. It was erected east of the house now occupied by the plaintiff. With-in two or three years thereafter, the house in controversy was erected on the land now owned by the plaintiff. It appears that, at the time these houses were erected, in 1894 and 1897, there were stakes still at the corner of these lots in the sub-divisions of Outlot 16. Whether they were the original stakes placed there at the time the plat was filed does not definitely appear. It does definitely appear, however, that the stakes

found at the corner of the land in controversy were of the
same character and kind and resembled the stakes found at
the corners of other lots in Subdivision 16. It appears also
that, while Mr. Koontz owned the property, in 1899, he put
in a cement sidewalk in front of the property claimed by the
plaintiff, and this walk extended the full length of the front-
age lot line now claimed by the plaintiff, and there were
marks made in the cement walks to indicate the lot corners as
claimed at that time. The house on the property occupied
by the plaintiff, as said before, was built somewhere about
1897. It was built within 18 inches of the west line, as
indicated by the stakes, and as indicated by the walk and
the markings on the walk placed there by Mr. Koontz. The
plaintiff and her grantors have occupied the house ever since
it was constructed.

W. E. Ricks, son of Ellen O. Ricks, testifies that he remem-
bers well when these houses were built upon Lot 14; that
he helped to build the second house, the one now occupied
by the plaintiff; that he found what he understood to be the
original survey stakes, or the stakes placed there at the time
the lots were subdivided. He testified that, in locating the
house, the wall was placed within 1 foot 6 inches of the line,
as indicated by the stakes and the markings upon the side-
walks. He is not able to say that these were the stakes put
in there by the surveyor who subdivided Lot 16, or that they
are the original stakes, but he says that he examined other
stakes in the addition, apart from the stakes on this lot, and
they were of the same character.

We think from the whole record that there is evidence
to show that stakes were found at the corners of these lots
at the time plaintiff's house was built in 1894. It appears
that the stakes found by the Rickses, at the time the house
was constructed, were at both the front and rear end of the
lot; that the house was placed 18 inches from a straight line
drawn between these stakes; that, at the time the house was
built, other stakes were driven inside of these stakes, which

indicate the line as claimed by the Rickses at the time they built the house.

Koontz testified that, somewhere in 1900, he had a cement walk put in, which is still there; that, at the time that he put in the walk, there were stakes at the corners of the lot; that he put in the sidewalk with reference to the stakes; that the sidewalk was 25 feet long, and immediately in front of the property owned by the plaintiff; that the sidewalk extended 18 inches beyond the west line of the building; that they measured between the stakes at the time the sidewalks were put in.

Frank Smith, husband of Lydia Smith, who, in 1904, acquired the property now owned by the plaintiff, testified that, during the time she occupied the premises, there was never any controversy over the line; that there was a mark in the sidewalk—a deep line right across the sidewalk—indicating the line, and at the point where the plaintiff now claims the line to be; that it was put there by the man who put in the sidewalk; that, when she purchased it, she took it to indicate the end of the walk; that, when she bought it and owned it, she claimed up to the line, as indicated by this mark upon the walk.

George Hedges testified that he sold the land in controversy for J. B. Scott to Mrs. Ricks as agent for Scott. He testifies that, at the time he sold the lot, there were stakes at each of the four corners of the lot. He was asked this question:

"Were the lots in the subdivision generally staked at the corners?"

He answered:

"Yes, sir. I had the sale of several lots in this subdivision, and had occasion to look over the lots with reference to the corners, and at the time Koontz purchased the lot now owned by the plaintiff, the stakes were still there. I pointed out the stakes to Mr. Koontz at the time he purchased."

He further testifies:

"I should say that the west line of plaintiff's lot, as shown by these stakes, is just a few inches from the dropping of the eaves. I later sold this property for Mr. Koontz to one Henry Long. The stakes were then there. I also made the sale to the plaintiff."

He further testifies: ·

"I remember when the stakes were set there. I don't know the date, but I remember the time. They were set by George W. Wynn."

He testified that the first time he noticed the stakes was at the time the lot was sold to Mrs. Ricks; that that was some 18 or 20 years ago; that the survey by Wynn was made and the stakes set out, about a year before the sale to Ricks. He testifies:

"I know Mr. Wynn made this survey and put in these stakes within a year before the time I sold the property to Ricks. It had been surveyed before, but I know nothing of that."

He further said:

"The stakes that I testified to were set out by Mr. Wynn, a reputable surveyor, more than 20 years ago, long before plaintiff purchased the land, and I think about a year before Mrs. Ricks purchased it."

Kepler, the defendant, built his house about 1910 or 1911. At the time he built the house, he made no question about the line. In building his house, he left a 6-foot space between the houses. After Kepler built his house, he built a cement walk around it, adjoining the house, and then requested the plaintiff to put in a 3-foot cement walk, in order that the plaintiff might have the privilege of carrying coal into her cellar. This the plaintiff did. This made a complete cement walk or drive between the two houses. ·

One Focht testified that he was agent for the plaintiff; that, along about 1911, he had a conversation with Mr. Kepler, the defendant, with reference to putting a cement walk between the two houses. Mr. Kepler said, in substance, that

he would like to put it in, for the reason that the grass wouldn't grow there, and it would be more sightly; and further that, if just a single walk was put in, the water would get into the cellars, particularly into the plaintiff's cellar, as his ground would be higher; also that the plaintiff had only about a foot of land between the lot line and her property, and that she would have no means of getting coal into her property without trespassing on his ground; and that, if the plaintiff would agree to pay half the expense of putting in a walk, it would be a benefit to her on account of the water, and he would allow her to carry coal into her property; that the cement walk was thereupon put in by Mrs. Helberg, and one half paid by her.

It further appears that there were, and had been for a number of years, two buildings on the rear end of these lots, one on plaintiff's and one on defendant's; that there was only a 2-foot space between these buildings. The defendant, when on the stand, was asked this question, touching these buildings on the rear end of this lot:

"How does the building on the rear end of your lot stand with reference to the claim that Mrs. Helberg makes to the west line—the line extending through 6 inches westerly of her cornice? Would that touch the building on the rear of your lot?"

The answer was:

"My building would clear the line as she contends, and would be all on my lot."

When Outlot 16 was subdivided and platted, the lots into which it was separated were indicated by stakes. These stakes marked the corners of the lots as they were created by the

1. BOUNDARIES: acquiescence: unfenced city lots.

platters, and marked their subdivision of Outlot 16. No dispute ever arose over the lines between these lots, until Mr. Kepler, the defendant, built his house, in 1911. Nearly all the parties who owned this lot since it was platted have testified, and seem to have conceded and recognized the line contended for by

plaintiff. Even the defendant, after he had acquired title to the lot now owned by him, recognized plaintiff's claim; for, in a conversation with Mr. Focht touching the building of a cement walk between the houses, he said Mrs. Helberg had only a foot between the lot line and her house, and would have no means of getting coal in without trespassing on his land, and that, if the space between the houses was cemented, he would allow her to carry coal in over the cement walk to her cellar.

We have said before that these lot lines were marked by stakes at the time the original plat was made. Upon this fact, the record is not clear; but it is clear that Wynn, in 1893, did place stakes at these corners, and did this at the instance of the then proprietor of the land in dispute; that these Wynn stakes were visible, and clearly indicated the lines of the lots. These stakes were there when plaintiff bought. They were there when she built her building, and we think they were there when defendant's grantors bought.

It is clear that, in 1893, there were stakes on the corners of all these lots, indicating the lines between the lots; that sales were made with reference to these lines; and we think the defendant recognized these lines when he made his purchase. We are not surprised that the witnesses are not all clear upon these different matters, and that, in their recitation of what they observed, there are some discrepancies and confusion; but the proposition still remains, we think, fairly well established by the record, that the lots into which this Outlot 16 were divided were, not later than 1893, at the instance of the then proprietors, plainly marked by stakes at the four corners of each lot; that each lot, as an entity segregated from the entire outlot, became fixed and made certain by these stakes; that they became, as it were, the metes and bounds of the lots, and marked the metes and bounds; that all who dealt with the lots, purchased with reference to these indications of the territorial extension of each lot. Even the defendant, until he got a surveyor to discover that

the stakes were not set at such point as his survey indicated they should be set, recognized these lines indicated by the stakes.

We say this because the stakes were there, and the sales were made with reference to the stakes. Buildings were erected with reference to the stakes, sidewalks were constructed with reference to the stakes, and the stakes, as placed, make the true boundary line between the lots brought into existence only by the subdivision made in the platting. These subdivisions, by the staking out, were arbitrary. They defined the lots, and the boundaries of the lots, without regard to whether the measurements were exact or otherwise. It was with reference to these stakes that the public was called upon to deal with the subdivisions; and, as long as these stakes remain, those who purchased and took possession in reliance upon the stakes can maintain their possession to the original stake line, regardless of whether these stakes have since been lost, or whether, by exact measurement, they would seem to have been placed on lines marking subdivisions according to the recorded plat.

Plaintiff's grantor, Mrs. Ricks, took possession of the lot in which plaintiff's land is situated, erected the building now standing upon the lot, and, by so doing, gave notice of her claim before this new survey was procured. Her house has stood there, with the eaves extending over within 6 inches of the line between the plaintiff's and defendant's lot, for nearly 20 years. We think this gave notice to the world of her claim as to where she claimed the true line was, and we think the placing of the stakes indicating the line between those lots more than 20 years before this survey was made, the building of this house with reference to the line, all charged the world with notice of plaintiff's claim, and, we think, indicated a clear purpose on the part of the defendant and his grantors to acquiesce in the line as the true line between the lots.

2. ADVERSE POSSES-
SION: notice of
claim: building
with reference
to survey stakes.

Further than that, we think it is the true line. We think it is the true line because it is the line established not only by the grantors of the plaintiff, but the grantors of the defendant, as well.

No good purpose would be served in reviewing the authorities. The law of acquiescence and of adverse possession has been fully reviewed by this court in its former decisions.

We think the equities are all with the plaintiff; that the court did not err in its decree; and the judgment is—*Affirmed*.

EVANS, C. J., LADD and SALINGER, JJ., concur.